Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4015 | **DATE** | 12/18/2000 |
| **CASE TITLE** | Millennium Products Inc. vs. Gravity Boarding Co. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, defendant's motion to dismiss for lack of subject matter jurisdiction and for lack of venue is denied, and defendant's motion to transfer is also denied. Discovery deadline set to 4/30/01. Status hearing set to 2/28/01 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 20 2000 date docketed | |
| ✓ | Docketing to mail notices. | | 12 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | 00 DEC 19 PM 4:03 DEC 20 2000 date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MILLENNIUM PRODUCTS INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> GRAVITY BOARDING CO., INC., ) <br> ) <br> Defendant. ) | Case No. 00 C 4015 |

## MEMORANDUM OPINION AND ORDER

DOCKETED

DEC 2 0 2000

MATTHEW F. KENNELLY, District Judge:

In this action, plaintiff Millennium Products Inc. seeks a declaratory judgment that it is not infringing U.S. Trademark Reg. No. 2,210,295, held by defendant Gravity Boarding Co. Gravity has moved to dismiss the complaint on the grounds that it does not present an "actual controversy" within the meaning of the declaratory judgment statute, 28 U.S.C. §2201, and because venue is lacking in this District. Alternatively, Gravity seeks transfer of this action to the Southern District of California pursuant to 28 U.S.C. §1404(a). For the reasons that follow, the Court denies both the motion to dismiss and the motion to transfer.

### Facts

Millennium is an Illinois corporation based in Chicago which manufactures and sells toys, including miniature snowboards and surfboards. Gravity is a California corporation based in San Marcos, California which manufactures, among other things, skateboards, snowboards, and surfboards.

The dispute that led to this action arose from Millennium's use of the phrase "Team

Gravity Collection" on toy snowboards and surfboards. Gravity has a registration for the term "Gravity" for use on skateboards, surfboards, snowboards, and other items. U.S. Reg. No. 2,210,295. Millennium applied for registration of the phrase "Team Gravity Collection" with the United States Patent and Trademark Office on July 19, 1999. It alleges that it began to use the mark as early as May 1999 and first used it in interstate commerce in October 1999. Gravity's president Michael Bream says that he first learned of this in October 1999 via an advertisement in a trade publication and called Millennium's chief executive officer Paul Koester to discuss the company's use of the phrase. Bream says that Koester replied that he was aware of Gravity's trademark and had been expecting a call. Bream states that he told Koester that Millennium's use of the term on its toys was "not a problem now" but that he "was concerned and would take a wait-and-see attitude." Bream Affid. ¶6.

According to Bream, he learned in March 2000 that Millennium was marketing toy surfboards in California using the term "Gravity" and again called Koester. He says he told Koester that Millennium's use of the term was creating confusion with Gravity's products, and he asked for a meeting to "work something out." *Id.* ¶7. Bream states that he scheduled several meetings in April 2000 but that Millennium canceled them. On May 24, 2000, he says, Koester came to Gravity's headquarters to negotiate a possible licensing agreement; Bream says he made a proposal to Koester for a one-time payment by Millennium of $10,000, plus $3,000 per month thereafter. *Id.* ¶¶7-8. He claims that Koester seemed receptive and said he would have his attorney draft some papers. *Id.* ¶8. When Bream did not receive anything, he telephoned Koester several times to discuss a possible licensing agreement; he says that in June 2000 Millennium offered a payment of $5,000 plus $1,500 per month. Bream rejected this proposal.

2

*Id.* ¶9.

According to Bream, he has not threatened to sue Millennium for trademark infringement and has not written any letters to Millennium stating that legal action was imminent. However, he did tell Koester (exactly when is not clear) "that there could come a time soon that [ ] Gravity would need to commence an action to protect its mark, [but that he] still hoped to resolve the parties['] dispute 'like gentlemen and without litigation." *Id.* ¶10. Following that conversation, Bream heard nothing more until he was served with summons. *Id.*

Koester has a somewhat different version of the parties' exchange. He says that when Bream first contacted him in October 1999, he "expressed concern that [Millennium's] mark was infringing on his Gravity Boarding trademark." Koester Affid. ¶3. Koester claims that between October 1999 and April 2000, he received no less than a dozen calls from Bream in which Bream expressed the view that Millennium was infringing Gravity's mark. *Id.* ¶4. He agrees with Bream's version of the terms of Gravity's initial offer but says that although Millennium explored the possibility of an agreement, "Bream was reluctant to enter into any formal agreement, did not want to sign anything, and just wanted the payment based on an informal, oral agreement." *Id.* ¶6. Finally, Koester asserts that Bream stated that "he felt [Millennium's] mark infringed [Gravity's], and that if Millennium did not agree to the amount demanded, 'he had their balls in his hands,' and would file suit within seven days against Millennium for infringement." *Id.* ¶8.

### Discussion

**A.  Motion to dismiss**

Gravity contends that there is no "actual controversy," as required under the Declaratory

3

Judgment Act. 28 U.S.C. §2201(a). The parties agree that the standard for determining whether an actual controversy exists in a case of this type is set forth in a decision by the Seventh Circuit in a patent case, *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). *See also G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 990 (7th Cir. 1989) (applying same test in trademark case). Under *International Harvester*, Millennium has the burden of establishing by a preponderance of the evidence (1) that it has produced the accused article or has engaged in preparations to do so and would begin production immediately but for a finding that the product infringes or unforeseen circumstances, and (2) that Gravity has engaged in conduct "giving rise to a reasonable apprehension ... that [Millennium] will face an infringement suit or the threat of one if it ... continues the activity in question." *International Harvester*, 623 F.2d at 1210; *see also G. Heileman Brewing*, 873 F.2d at 990. In this case it is undisputed that Millennium can meet the first element of the *International Harvester* test. Gravity trains its guns on the second element.

According to Gravity, Millennium had no reasonable apprehension of being sued because the parties were engaged in licensing negotiations that were still ongoing when Millennium abruptly filed suit. The parties cite no Seventh Circuit decisions dealing with this particular scenario. Though not cited by the parties, however, the Federal Circuit has dealt with this situation in the patent context. Because that Circuit appears to follow the same general test as set forth in *International Harvester, see, e.g., Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1052 (Fed. Cir. 1995), its decisions are helpful in resolving the present dispute.

In *Phillips Plastics*, the evidence reflected that in 1987, an attorney for the defendant

4

patentee wrote a letter to the plaintiff saying that a product the plaintiff made was covered by defendant's patent and that defendant would be willing to license plaintiff. The plaintiff responded that it believed defendant's patent to be invalid, and it heard nothing further. In 1989, plaintiff objected before the Patent and Trademark Office when defendant sought reissuance of the patent. In June 1992, defendant's attorney again wrote to plaintiff, enclosing a copy of the reissued patent and again offering a license. Correspondence between the parties followed, and in September 1992 defendant asked for sales and pricing information to use in putting together a license proposal. Plaintiff never responded to this request. In December 1992, it filed a declaratory judgment action.

The evidence in *Phillips Plastics* indicated that defendant had "carefully refrained from threatening [plaintiff] with suit, either expressly or implicitly, as it attempted to open license negotiations ...." *Id.* at 1052. Rather, all that had taken place was that defendant had expressed its view that plaintiff's product was covered by its patent and had offered a license. The court stated that "[t]he offer of a patent license does not create an actual controversy. ... License terms were yet to be discussed. When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Id.* at 1053. There was no indication, however, that a breakdown had occurred. The court concluded that "[t]he 'reasonable apprehension of suit' test requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Id.* at 1054. Though the test "does not require that the patentee be known to be poised on the courthouse steps, a patentee's attempt to conduct license negotiations is a commercial activity. [Defendant's] activity was not a threat of suit, and did not create a justiciable controversy." *Id.*

5

The Federal Circuit revisited this issue in *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996), a case that presented a factual scenario somewhat closer to the present case than the one in *Phillips Plastics*. In *EMC,* the president of a consulting company representing the patentee wrote to the plaintiff suggesting that the parties initiate license negotiations concerning defendant's patents. After receiving no reply, the consultant again wrote to suggest license negotiations; this time he added that the defendant had asked him turn the matter over to defendant's outside patent counsel, but that he wanted to have a preliminary business discussion, "perhaps avoiding this matter escalating into a contentious legal activity." *Id.* at 809. Meetings ensued at which the potential sale or license of the patents was discussed. Plaintiff claimed that defendant's representatives made express claims of infringement; defendant denied this and also denied that its representatives had threatened suit. After a meeting at which defendant advised plaintiff that there were other companies in plaintiff's market that defendant was approaching to discuss licensing or sale of the patents, plaintiff filed a declaratory judgment action. *Id.* at 809. Following the filing of suit, plaintiff's attorney told defendant's attorney that the action had been filed as "merely a defensive step" because "it was in [plaintiff's] interest to protect themselves first," but that plaintiff still would like to continue negotiating. *Id.*

The court said that the "reasonable apprehension" test "does not require an express charge of infringement and threat of suit; rather, such apprehension maybe induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,' i.e., to initiate an infringement action." *Id.* at 811 (quoting *Shell Oil v. Amoco,* 970 F.2d 885, 889 (Fed. Cir. 1992)). The mere existence of an adverse patent, the offer of a license, and/or the existence of ongoing license negotiations is not enough to establish the existence of an

6

actual controversy within the meaning of the Declaratory Judgment Act, but "when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue, but can take the initiative and seek declaratory relief." *Id.* at 811. Applying these standards, the court concluded that defendant's conduct "created a reasonable apprehension on [plaintiff's] part that [defendant] would sue if [plaintiff] did not satisfy [defendant's] economic demands." *Id.* at 812. In contrast to *Phillips Plastics,* the patentee in *EMC* had indicated that it would pursue legal recourse if it was not satisfied with the outcome of the licensing negotiations. *Id.* Under the circumstances, an "actual controversy" existed within the meaning of the Declaratory Judgment Act.

The Court went on to note that the existence of an actual controversy did not require the district court to exercise jurisdiction; a court has a "'unique breadth of ... discretion to decline to enter a declaratory judgment.'" *Id.* at 813 (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287 (1995)). The district court in *EMC* had in fact declined to exercise jurisdiction, believing that to do so would encourage parties negotiating with patentees to use the declaratory judgment procedure as leverage to improve their bargaining position and to impede negotiations between the patentee and other potential buyers or licensees; it suggested that the plaintiff may have filed suit in the hope of forestalling the sale of the defendant's patents to one of the plaintiff's competitors. *Id.* at 810. The Federal Circuit declined to disturb the district court's discretionary decision not to exercise jurisdiction.

The first issue in this case concerns how the Court should resolve the conflicts in the parties' affidavits. As noted earlier, the parties' versions of what Gravity told Millennium

7

sharply contradict each other in certain respects.[1] Gravity's president Bream says that though he did indicate that "there could come a time soon" when Gravity would need to file suit, he denies any express threat of litigation. Millennium's president Koester, by contrast, describes a direct threat of immediate suit that included the use of a graphic metaphor. The parties have cited no authority regarding how such conflicts are to be resolved. In the somewhat related context of a motion to dismiss for lack of personal jurisdiction, however, it is well established that conflicts in the parties' affidavits are to be resolved in the plaintiff's favor, that is, in favor of the exercise of jurisdiction. *See, e.g., RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). As Gravity has offered no contrary authority, we follow the same principle here.

Once the conflicts in the affidavits are resolved in Millennium's favor, it becomes evident that Millennium has satisfied the *International Harvester* test, even when considered in light of the Federal Circuit's decisions in the licensing context. According to Koester, Bream gave him an ultimatum: agree to Millennium's proposal or be sued within a week. And even if Bream's version is believed, Bream made at least an *implicit* threat of litigation. Either way, Bream's statements were sufficient to place Millennium in reasonable apprehension of litigation under the Federal Circuit's decision in *EMC*, as well as under *International Harvester*: in the words of the latter case, there was at a minimum "an implied charge of infringement or of a course of conduct

---

[1] We reject Gravity's argument that certain statements in Millennium's affidavits are not specific enough or do not include sufficient foundation to be considered. From the context of Koester's affidavit, it is reasonably clear that he is making reference to conversations he claims to have had with Bream. Koester is no less specific than Bream regarding the dates of the key conversations. *See* Bream Affid. ¶10.

8

which would lead a reasonable [person] to fear that he or his customers face suit or the threat of suit." *International Harvester,* 623 F.2d at 1211.

Gravity does not argue (as did the defendant in *EMC*) that the Court should nonetheless exercise its discretion to decline jurisdiction. And even if Gravity had made such a request, the Court would reject it. This does not appear to be a case in which the plaintiff pulled the plug on ongoing negotiations in the hope of finding a favorable forum. Rather (assuming the conflicts in the affidavits are resolved in plaintiff's favor), after a period of negotiation, Millennium was given an ultimatum to agree to Gravity's terms or face immediate suit. Once that happened, Millennium was not required to sit idly by and wait for the process server to arrive; the very purpose of the Declaratory Judgment Act is "to enable those threatened to remove such a cloud on their commercial activity, instead of being obliged to await the convenience of the threatening party." *Phillips Plastics,* 57 F.3d at 1053. In sum, the filling of suit was not, as in *EMC,* a "tactical measure filed in order to improve [plaintiff's] posture in the ongoing negotiations," *EMC,* 89 F.3d at 815, but rather a step taken in order to avoid being left with the choice of knuckling under to Gravity's demands or waiting for the inevitable infringement suit. Under the circumstances, the Court does not believe that this is an appropriate case to decline the exercise of jurisdiction.

Gravity also argues that venue is lacking in this District. Its argument in this regard, however, is only one paragraph long and is not supported by any authority. Based on the parties' affidavits, it appears that Gravity initiated contact with Millennium in Illinois and that it does a significant amount of business in this state. Under the circumstances, and in view of Gravity's failure to develop this argument in its opening briefs or its reply, the Court concludes that venue

9

properly exists in this District.

**B.     Motion to transfer**

Gravity has also moved under 28 U.S.C. §1404(a) to transfer the case to the Southern District of California. It is undisputed that venue would be proper in that District, and thus the question is whether Gravity has established that the transfer would serve the convenience of the parties and the witnesses and would be in the interest of justice. As the party seeking transfer, Gravity has the burden of demonstrating that the transferee court is clearly more convenient. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986). In evaluating the convenience of the parties and witnesses, the Court considers: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience of the parties of litigating in the respective forums. *See, e.g., Brandon Apparel Group, Inc. v. Quitman Manufacturing Co.*, 42 F. Supp. 2d 821, 833 (N.D. Ill. 1999).

Millennium's choice of this District is entitled to substantial weight, particularly because it is Millennium's home district and because some of the material events (namely its design of the "Team Gravity" mark and its decision to the mark on its products) took place here. *See, e.g., Brandon*, 42 F. Supp. 2d at 833. With regard to the convenience of witnesses, Gravity focuses on the fact that its personnel who have knowledge about its use of the mark and Millennium's use of "Team Gravity Collection" are all located in the San Diego area. However, the convenience of witnesses who are employees of a corporate party is less significant than that of non-party witnesses; it is reasonable to assume that these employees will be made available for trial, and there is no indication that bringing them to Chicago would unduly disrupt Gravity's

10

business. *See generally College Craft Companies, Inc. v . Perry,* 889 F. Supp. 1052, 1055 (N.D. Ill. 1995). In its reply, Gravity argues that "[r]esolution of Millennium's claim will likely turn on the extent to which Millennium was selling products in California [where Gravity is located], to who [sic], and for what purpose." Dfdt. Reply, p. 5. This vague and unsupported assertion does not, however, provide a sufficient basis for the Court to conclude that the convenience of witnesses clearly would be better served by transferring the case. For the same reason, there is no basis to conclude that transfer of the case to California would improve the parties' access to sources of proof.

Finally, there is no question that transfer of the case would make litigation more convenient for Gravity, just as keeping the case here makes it more convenient to Millennium. But it is well established that a motion under §1404(a) will not be granted simply to shift the balance of inconvenience from the defendant to the plaintiff, and that is the only thing that Gravity has shown would be accomplished by transfer. *See, e.g., Heller Financial, Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir. 1989); *Lee, Mann, Smith, McWilliams, Sweeney & Ohlson v. Esposito,* No. 93 C 7054, 1993 WL 526375, at *2 (N.D. Ill. Dec. 13, 1993); *Unityte v. Lohr Structural Fasteners, Inc.,* 768 F. Supp. 665, 667 (N.D. Il. 1991). Under the circumstances, Millennium is entitled to have the case litigated in the forum it chose.

## Conclusion

For the reasons stated above, defendant's motion to dismiss for lack of subject matter jurisdiction and for lack of venue is denied, and defendant's motion to transfer is also denied.

Defendant is directed to answer the complaint or on before January 2, 2001.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 18, 2000